In re John P. RYAN, Jr., Debtor.

United States of America, Plaintiff,

v.

John P. Ryan, Jr., Defendant.

Bankruptcy No. 00–44649–JWV.
Adversary No. 01–04143–JWV.

United States Bankruptcy Court,
W.D. Missouri,
Western Division.

Nov. 19, 2002.

Robert D. Metcalfe, Washington, DC, for plaintiff.

Ronald S. Weiss, Kansas City, MO, for debtor/defendant.

### *MEMORANDUM OPINION AND ORDER*

JERRY W. VENTERS, Bankruptcy Judge.

This adversary proceeding comes before the Court on the United States of America's ("IRS") Complaint to Determine the Dischargeability of Debts under 11 U.S.C. § 523(a)(1)(C). The Court held a trial on this matter at the Federal Courthouse in Kansas City, Missouri, on October 24, 2002. At that time, the Court announced that it would take this matter under advisement. The Court has reviewed the pleadings, relevant case law, the stipulated facts, and the evidence adduced at trial and is now ready to rule.

For the reasons set out below, the Court finds that the Debtor engaged in a pattern of conduct in which he willfully and deliberately attempted to evade or defeat his lawful tax obligations for the tax years of 1988, 1989, 1991, 1993, and 1994. Therefore, the Court finds that the unpaid income tax and accrued interest for those years is nondischargeable pursuant to 11 U.S.C. § 523(a)(1)(C).[1]

### FACTUAL BACKGROUND

The parties have agreed to a stipulation of the facts in this case and to the authenticity of the exhibits admitted into evidence. In addition, there was substantial evidence adduced at trial.

### A. Joint Stipulation of Facts

1. This is an adversary proceeding brought by the United States of America pursuant to Sections 523(a)(1)(C) and 727(b) of the Bankruptcy Code (11 U.S.C.), and Rule 4007 of the Rules of Practice and Procedure in Bankruptcy against the defendant, John P. Ryan, Jr., to obtain a determination of the dischargeability of the federal income taxes assessed against him for the 1988, 1989, 1991, 1993 and 1994 taxable years in the above-captioned Chapter 7 case.

2. The defendant, John P. Ryan, Jr., who resides at 3000 East 195th Street, Belton, Missouri, within the jurisdiction of this Court, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of Missouri on December 7, 2000.

3. A discharge under Section 727 of the Bankruptcy Code was entered in the

---

1. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure. This is a

core proceeding arising under 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction in this matter pursuant to 28 U.S.C. § § 157(a) and 1334.

above-captioned Chapter 7 bankruptcy case on August 13, 2001.

4. The Internal Revenue Service filed a Proof of Claim for Internal Revenue Taxes filed in the above-captioned Chapter 7 bankruptcy case with respect to the federal income taxes and statutory additions to tax assessed against debtor, John P. Ryan, Jr., for the taxable periods and in the amounts set forth below:

| Taxable Year Ending | Date of Assessment | Tax Due | Penalty to Petition Date | Interest to Petition Date |
|---|---|---|---|---|
| 12/31/88 | 08/21/92 | $ 0.00 | $ 5,446.93 | $ 56,822.68 |
| 12/31/89 | 10/19/92 | $ 57,101.00 | $ 28,230.08 | $ 113,947.44 |
| 12/31/91 | 10/17/94 | $ 4,868.30 | $ 8,532.34 | $ 16,557.49 |
| Taxable Year Ending | Date of Assessment | Tax Due | Penalty to Petition Date | Interest to Petition Date |
| 12/31/93 | 06/24/96 | $ 9,923.00 | $ 5,025.42 | $ 9,926.58 |
| 12/31/94 | 09/23/96 | $ 40,991.00 | $ 21,426.25 | $ 33,090.52 |

5. The pre-petition penalties assessed against the debtor, John P. Ryan, Jr., relate to events which took place more than three years prior to the filing of the petition for relief in the above-captioned Chapter 7 case, and are accordingly dischargeable under Section 727 of the Bankruptcy Code.

6. The unpaid balances of the federal income taxes assessed against Ryan for the taxable years at issue in this adversary proceeding are as follows:

| Tax Year | Unpaid Income Tax | Accrued Interest (to 10/24/02) |
|---|---|---|
| 1988 | $ 0.00 | $ 50,569.04 |
| 1989 | $ 57,101.00 | $ 141,331.73 |
| 1991 | $ 4,868.30 | $ 20,712.61 |
| 1993 | $ 9,923.00 | $ 13,440.49 |
| 1994 | $ 40,991.00 | $ 46,582.19 |

7. In this adversary proceeding, the United States contends the debtor's 1988, 1989, 1991, 1993 and 1994 federal income taxes are excepted from discharge under Section 523(a)(1)(C) of the Bankruptcy Code (11 U.S.C.) because of his alleged willful attempts to evade or defeat those taxes.

8. The actual dates on which John P. Ryan, Jr. filed his 1988, 1989, 1991, 1993 and 1994 federal income tax returns (Forms 1040) were as follows:

| Tax Year | Date of tax return filing |
|---|---|
| 1988 | July 12, 1990 |
| 1989 | July 30, 1992 |
| 1991 | August 22, 1994 |
| 1993 | February 8, 1996 |
| 1994 | June 18, 1996 |

9. The federal income taxes described in paragraph 6, above, were assessed solely against the debtor because he filed separate federal income tax returns with the IRS for those taxable years.

10. John P. Ryan, Jr., P.C., was incorporated under the Professional Corporations Act of Missouri on March 1, 1993. *See* Plaintiff's Exhibit 9.

11. John P. Ryan, Jr. ("Ryan") was the incorporator of John P. Ryan, Jr., P.C. *See* Plaintiff's Exhibit 10.

12. John P. Ryan, Jr., P.C. was incorporated as a Professional Corporation (as set forth in Article Eight of its Articles of Incorporation) for reasons which included "[t]he operation of a law office." *See* Plaintiff's Exhibit 9.

13. The 1993—1998 Annual Registration Reports filed by or on behalf of John P. Ryan, Jr., P.C. with the Missouri Secretary of State show that the debtor served continuously as its president from the time of its incorporation in 1993 until its dissolution. *See* Plaintiff's Exhibits 11–17.

14. The 1993—1998 Annual Registration Reports filed by or on behalf of John P. Ryan, Jr., P.C. with the Missouri Secretary of State reflect that Linda C. Ryan (Ryan's wife) was its corporate secretary at all times pertinent to this adversary proceeding, and that Ryan and his wife were the only stockholders in the Corporation. *See* Plaintiff's Exhibits 11–17.

15. On March 4, 1996, at approximately 3:30 p.m., Revenue Officer Osborn served an IRS Notice of Levy on Wages, Salary, and Other Income (Form 668–W) on John P. Ryan, Jr., P.C. to administratively seize any wages, salary and other income due Ryan from his Corporation in satisfaction of his 1988, 1989 and 1991 federal income tax liabilities. *See* Plaintiff's Exhibit 6.

16. Osborn served the Notice of Levy on John P. Ryan, Jr., P.C. by handing it to Jennifer R. Reagan, an attorney and associate office manager for the Corporation.

17. Ryan owed $232,645.34 in unpaid federal income taxes and statutory additions to tax for the 1988, 1989 and 1991 tax years at the time the IRS notice of levy was served on March 4, 1996. *See* Plaintiff's Exhibit 6.

18. On March 19, 1996, Revenue Officer Osborn served a Final Demand (Form 668–C) on the Corporation. *See* Plaintiff's Exhibit 7.

19. The Internal Revenue Service received no payments from John P. Ryan, Jr., P.C. pursuant to the Notice of Levy and Final Demand described above.

20. Revenue Officer Osborn received a letter dated March 30, 1996, in response to the Notice of Levy served on John P. Ryan, Jr., P.C., which stated that:

> In Response to the levy served on this corporation, a copy of which is attached, please be advised this corporation does not have any property due John P. Ryan at this time.

*See* Plaintiff's Exhibit 8.

21. The March 30, 1996 letter was signed by Ryan on behalf of John P. Ryan, Jr., P.C. *See* Plaintiff's Exhibit 8.

22. Subsequent to March 4, 1996, Revenue Officer Osborn recommended that a civil suit be brought against the Corporation pursuant to Section 6332(d) of the Internal Revenue Code.

23. The United States sued John P. Ryan, Jr., P.C. under Section 6332(d) of the Internal Revenue Code for its alleged refusal to honor the March 4, 1996 levy. The complaint in that action was subsequently amended to add Ryan as a defendant and reduce to judgment Ryan's 1988, 1989 and 1991 federal income tax liabilities. *See* Plaintiff's Exhibit 62.

24. On October 12, 1999, judgment was entered in favor of the United States and against Ryan and his corporation, John P. Ryan, Jr., P.C., in the civil action entitled *United States v. John P. Ryan, Jr. and John P. Ryan, Jr., P.C., a Missouri Corporation,* Case No. 97–1424–CV–W–5 (USDC W.D. Missouri). *See* Plaintiff's Exhibit 63.

25. In the October 12, 1999 judgment, the United States received judgment for the unpaid balance of the tax assessments made against Ryan for his unpaid 1988, 1989 and 1991 federal income tax liabilities.

26. Judgment was also entered against John P. Ryan, Jr., P.C., and in favor of the United States, for: (1) $100,000, plus interest according to law from March 4, 1996 (the date of the IRS levy on the Corporation), under Section 6332(d)(1) of the Internal Revenue Code for the Corporation's wrongful refusal to honor the IRS levy; and (2) $50,000, under Section 6332(d)(2) of the Internal Revenue Code, because the Corporation's refusal to honor the March 4, 1996 levy was without "reasonable cause."

27. After Ryan failed to pay the judgment entered against him, the United States sought an installment payment order under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, et seq. The District Court scheduled a hearing on the Government's request for an installment payment order for December 7, 2000. See Plaintiff's Exhibits 65 and 66.

## B. Additional Findings of Fact

In addition to the stipulated facts, the Court makes the following factual findings from the evidence adduced at trial:

Ryan began practicing law in 1967 after returning from a tour of duty in Vietnam. For most of his nearly 35 years in practice, he has been self-employed. Ryan admitted that he knew he had a duty to pay federal income tax but was unaware that he was required to make quarterly estimated tax payments. Accordingly, he has never submitted any quarterly payments of estimated taxes. When he would apply for an extension to file his income tax returns, he was legally required to pay 90% of his estimated income tax; however, although he made some payments in this manner, the payments never amounted to the required 90% of the tax owed. (Def.'s Ex. 6)

Revenue Officer Melvin Osborn ("Osborn") attempted to identify assets belonging to Ryan that might be seized to satisfy the federal income tax liabilities. As part of his investigation, Osborn found that most of Ryan's major assets were titled jointly and held in tenancy by the entireties with his wife, Linda C. Ryan (referred to herein as "Chris Ryan"). The Ryans own a 115–acre farm, rental properties—including the building where Ryan has his law office—and a storage company, all held in tenancy by the entireties.

Osborn's investigation of bank records for the corporate checking account of John P. Ryan, Jr., P.C. revealed that $1,139,117.01 was deposited from March 5, 1996, through June 30, 1998. (Pl.Exs. 28–30) From his examination of the bank records, Osborn determined that funds were being transferred from the corporate checking account of John P. Ryan, Jr., P.C. to the joint checking accounts of Ryan and his wife at the same bank (accounts No. 400383732 and No. 400760927). The total amount of the funds transferred from the checking account of the corporation to Account No. 400760927 after the service of the Notice of Levy on March 4, 1996, through June 30, 1998, was $43,500.00, and the total amount transferred to Account No. 400383732 in that same period was $34,200.00. (Pl.Exs. 28–33) The bank records also disclosed that several checks were written to Ryan and/or his wife in the same time period for a total of $67,879.91. (Pl.Ex. 42–48) Ryan admitted that some of these checks were for personal expenditures. Two transactions are particularly noteworthy. For one, Ryan's professional corporation paid for a John Deere Tractor for $19,000.00 on July 12, 1996, that was

intended for Ryan's personal use. Ryan explained that this was a personal loan from the corporation so that he and his wife would have the funds necessary to purchase the tractor while they were awaiting financing. He also testified that as soon as the financing was available he deposited the proceeds into the corporate checking account to repay the loan. (Pl. Ex. 41) The bank records did reflect a subsequent deposit of more than $19,000.00. (Pl.Ex. 28) The second transaction of note occurred on July 30, 1996, when the corporation received a wire transfer of funds in the amount of $44,988.00. (Pl.Ex. 28). On that same date, the corporation issued a check for $44,988.00 to Ryan personally. (Pl.Ex. 43) Ryan testified that the $44,988.00 received by the corporation represented proceeds from a loan Ryan and his wife had obtained from a bank in Colorado. Ryan explained that the bank in Colorado had made a mistake and the funds should have never been placed in the corporate account. This loan was secured by a condominium the Ryans owned in Gunnison, Colorado. Ryan testified that he paid approximately $53,000.00 for the property but was unsure of when it was purchased. Ryan's oldest son, Jack, used the condominium while he attended college in Colorado. Ryan testified that the condominium was later sold for approximately $60,000.00 in 1997 or 1998.

In addition to providing housing for his oldest son while he attended college in Colorado, Ryan testified that he and his wife had provided money for college expenses to each of their three children. Ryan stated that for the years 2000 and 2001 he paid approximately $30,000.00 each year for his youngest son to attend Notre Dame University. At the same time he provided tuition of approximately $1,300.00—$1,500.00 per semester for his daughter to attend a local state university.

Ryan testified that he paid these personal expenses for his children even though he knew of his tax liability because he loved his family and wanted to offer them the best opportunities.

As set out in the stipulated facts, Ryan incorporated his law practice in 1993. Ryan was the principal lawyer in the firm; he testified that at times he had two associates who worked with him. The corporation reported income of $227,669.00 for the last seven months of 1993 (it was incorporated in June). In 1994, it reported gross income of $448,703.00, and in 1995 it reported gross income of $537,659.00. (Pl. Exs. 34–36) After the IRS levy was served on March 4, 1996, Ryan stopped receiving a salary from the corporation. Ryan testified that he needed to support his family so he discontinued paying himself a salary so that the IRS would not be able to collect on its levy. For the first few months of 1996, before the levy was served, Ryan received $10,000.00 in compensation from the corporation. (Pl.Exs. 18–19) Ryan explained that while his corporation was still operating, and after the IRS levy was served, he accepted new clients personally, not on behalf of the corporation. It is his testimony that he had clients separate from the corporation and received fees from those clients that were not deposited into the corporate checking account. Ryan testified that as president of the corporation he alone was responsible for the decisions made for the corporation.

On October 23, 2002, just one day before the trial of this matter, Ryan hand-delivered to the IRS's Kansas City Service Center his tax returns for 1998, 1999, 2000, and 2001. For 1998, Ryan filed a joint return with his wife, and they claimed entitlement to a refund of $213.00. However, Ryan testified that he filed separate returns for himself for 1999, 2000, and 2001, and that he owes taxes on those

returns of $23,251.00 for 1999, $33,168.00 for 2000, and $45,717.00 for 2001, a total of more than $100,000.00. Ryan expressed shock at the amount of unpaid taxes for those years, but testified that he would pay them.

Additional facts necessary for a resolution of the issues will be set out in the Discussion section below.

## DISCUSSION

■ The Bankruptcy Code allows most debtors to "reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). However, there are limitations to this principle; certain conduct or acts of the debtor can lead to the forfeiture of this opportunity. *See, e.g.,* 11 U.S.C. § 523(a) and § 727(a). One such limitation is § 523(a)(1)(C), which Congress specifically enacted to make sure that the Bankruptcy Code did not become a inappropriate vehicle for tax evasion. *In re Spirito,* 198 B.R. 624, 629 (Bankr.M.D.Fla.1996).

Section 523(a)(1)(C) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

\* \* \* \* \* \*

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

11 U.S.C. § 523(a)(1)(C).

■ Although the Eighth Circuit Court of Appeals has not addressed the issue of what constitutes "willfully attempted in any manner to evade or defeat such tax" for purposes of § 523(a)(1)(C), the Bankruptcy Appellate Panel for the Eighth Circuit has addressed this issue. In *In re May,* 251 B.R. 714, 718 (8th Cir. BAP 2000), the court held that "[i]f a debtor is aware of the duty to pay his taxes, has the wherewithal to pay the taxes and takes steps to avoid paying them, there is a willful attempt to evade or defeat the tax." *See also United States v. Carnes (In re Carnes),* 244 B.R. 435 (Bankr.W.D.Mo.2000). Intent to evade taxes is generally proven by circumstantial evidence and reasonable inferences drawn from the existence of certain fact patterns called badges of fraud. "In the income tax area, badges of fraud include significant understatements of income made repeatedly; failure to file tax returns; repeatedly filing returns late; implausible or inconsistent behavior by the taxpayer; and failure to cooperate with federal tax authorities." *Berzon v. United States,* 145 B.R. 247, 250 (Bankr.N.D.Ill.1992).

■ To prevail under § 523(a)(1)(C), the IRS does not have to show that the debtor had an evil motive or bad purpose in not paying his taxes. *Wright v. IRS (In re Wright),* 191 B.R. 291, 292 (S.D.N.Y. 1995). Instead, the government is required to prove that the debtor's attempts to avoid tax liability were "voluntary, conscious, and intentional." *In re Toti,* 24 F.3d 806, 809 (6th Cir.), cert. denied, 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994). Evasion may be established by acts of omission as well as acts of commission. *Matter of Bruner,* 55 F.3d 195, 200 (5th Cir.1995); *Toti,* 24 F.3d at 809. The burden of establishing that the tax debts are excepted from discharge falls on the government. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Therefore, the IRS must prove by a preponderance of the evidence

that Ryan *either* filed a fraudulent tax return *or* that the Debtor willfully attempted to evade or defeat his tax liabilities. *Id.*

Applying these rules to the facts of this case, it is clear to the Court that Ryan engaged in a pattern of conduct designed to willfully evade or defeat the taxes he owed for 1988, 1989, 1991, 1993, and 1994.[2]

### 1. Failure to pay estimated taxes

Ryan began practicing law in 1967 after returning from a tour of duty in Vietnam. For most of his nearly 35 years in practice, Ryan has been self-employed, and therefore has been required by provisions of the Internal Revenue Code[3] to pay his own taxes, rather than relying on others to withhold and transmit those taxes to the IRS for him. Despite this legal requirement, Ryan has never paid any estimated taxes—not for the five tax years in question, and not for the following years and continuing right up to the present day. In the face of levies by the IRS and other collection efforts, Ryan has refused to change his pattern of ignoring the tax laws. As a result, he continues to incur unpaid tax liabilities in the tens of thousands of dollars. This blatant disregard for the requirements of the tax law can only be deemed deliberate and intentional.

Remarkably, this failure has continued up to the trial of this matter. Ryan filed his tax returns for 1998, 1999, 2000, and 2001 the day before the trial in this Adversary Proceeding was to begin, by personally hand-delivering them to the IRS Service Center in Kansas City.[4] Once again, Ryan did not pay estimated taxes on a quarterly basis. As a result, he now owes taxes of $23,251.00 for 1999, $33,168.00 for 2000, and $45,717.00 for 2001, before the imposition of penalties and interest.

In his testimony and in counsel's argument, Ryan seemed to suggest that his failure to pay his taxes on a timely basis should be excused or overlooked because he has seldom worked in a corporate setting where his taxes would be withheld by the employer. This argument turns things upside down. Since Ryan has worked virtually all of his adult life in a self-employed situation, he should be well acquainted with the provisions of the tax law requiring quarterly estimated tax payments. He cannot blame his own failure to withhold sufficient funds from his income to make his quarterly tax payments on the fact that someone else failed to withhold the taxes for him. By deciding to be self-employed, Ryan has chosen to be personally responsible for the payment of his taxes, a responsibility that he has totally failed to shoulder.

### 2. Failure to timely file tax returns

The IRS argues that one factor that tends to prove Ryan's intention to evade his income tax obligation is his repeated failure to timely file tax returns. While direct proof is seldom available as to a debtor's intent, reasonable inferences can be drawn from certain patterns of conduct, including repeatedly filing late returns. *In re Binkley*, 176 B.R. 260, 265 (Bankr. M.D.Fla.1994).

---

**2.** It has not been alleged that Ryan filed a fraudulent tax return.

**3.** Individual taxpayers are required to pay quarterly installments of estimated taxes pursuant to 26 U.S.C. § 6654.

**4.** Apparently, Ryan did this in an attempt to impress the Court; his counsel argued that, despite all his past transgressions, Ryan was now current in the filing of all of his returns. The Court is not impressed by such a transparent and self-serving act.

For the five years at issue, Ryan never once filed his federal income tax return on time. In fact, for all five years, his tax returns were filed more than one year late; in two years, they were filed more than two years late.[5] In attempting to explain away his late filings, Ryan testified that he was "just dilatory" and that he was "distracted by other things," referring to his law practice. While this testimony may be honest, it is just not credible as an excuse for his persistently late filings. Clearly, Ryan chose to put other things ahead of his statutory obligation to report and pay his taxes. As just noted hereinabove, Ryan's pattern of filing his tax returns years after they are due has continued to the present day. His failure to timely file his tax returns evidences his intent to evade or defeat his lawful tax obligations.

### 3. Failure to make voluntary tax payments

After the IRS initiated its collection efforts, Ryan did not make any voluntary payments on his taxes and did not attempt to work out a voluntary payment agreement, even though he had, by that time, become somewhat familiar with Osborn and perhaps others in the IRS's collection division. Without even making an inquiry, Ryan decided that it would be pointless to offer voluntary payments in view of the large amount of taxes owed.[6]

In fact, it appears from the testimony and documentary evidence that the only times Ryan has voluntarily paid anything on his tax obligations have been when he received a salary from his professional corporation, when the IRS collected minimal amounts from its levies, and when Ryan filed for extensions of the tax-filing deadlines. In each of those instances, the tax payments were effectively compelled. Therefore, Ryan has not *voluntarily* made any tax payments since at least 1989.

### 4. Failure to pay taxes when he had an apparent ability to do so.

According to Ryan's testimony, he lost substantial amounts of money in high-risk investments in 1988 and 1989, and this made it impossible for him to pay his taxes. However, it is notable that Ryan had total income of $101,847.00 in 1988 and $227,507.00 in 1989, incomes that were very substantial and would have allowed him to pay his taxes and still support his family in comfort.[7] Nevertheless, in 1989, Ryan paid absolutely no taxes, and ended that year with a $60,963.00 tax delinquency. (Debtor's Ex. 6)[8] Ryan admitted that these high-risk investments were made

---

5. It is worth noting that Ryan filed separate returns except in those years such as 1996 and 1998 when there was no tax liability. When Ryan was questioned about his filing status he indicated that he followed the advice of his tax preparer. However, Michael J. Messina, Ryan's tax preparer, testified that he usually followed his client's direction in deciding filing status. Messina stated that it was not his practice to make comparisons for his clients so that they would be able to tell which filing status might yield a more favorable tax return. Messina conceded that, generally speaking, most married taxpayers fare better when choosing a "married filing jointly" status. In the case of the Ryans, Messina contended that it would not be fair to Chris Ryan to subject her to a tax liability for which she was not responsible.

6. Considering Ryan's record of paying his taxes—or, more accurately, *not* paying his taxes—any promises of voluntary payments would have to be taken with the proverbial grain of salt.

7. Ryan did not file his tax return for 1988 until July 12, 1990. He did not file his 1989 tax return until July 30, 1992.

8. Ryan's 1988 taxes were eventually paid in full, though there is still an interest delinquency of more than $56,000.00. It is not clear when the 1988 taxes were finally paid.

with the earnings from his law practice. Clearly, then, Ryan made a conscious decision to risk his substantial earnings in speculative investments rather than making the tax payments he was required to make.

It is noteworthy that Ryan never testified at any time that he did not have sufficient money with which to pay his taxes. Rather, he testified that he did not have enough money to pay his delinquent taxes *and* support his family (apparently in the style and comfort he, or they, desired), and therefore he chose to use his money to support his family. This testimony is simply not credible. Between 1988 and 1994, a period that covers the years at issue here, Ryan had annual income, according to his own Exhibit 6, that ranged between $27,219.00 and $227,507.00. In two of those years, his income exceeded $200,000.00; in three other years, his income exceeded $100,000.00; and only once did his income fall below $50,000.00. Despite this income—which exceeded $850,000.00 over a period of seven years—Ryan failed to pay $141,299.00 in federal income taxes.[9] It is all too obvious that Ryan did, indeed, have substantial income with which to pay his taxes, and it is even more obvious that he made the deliberate choice to spend his money in other ways than paying his taxes.

Furthermore, during the period of time Ryan was not paying his taxes, Ryan and his wife purchased a condominium in Colorado for approximately $53,000.00. Ryan offered no testimony on the source of funds used to purchase this property, although he indicated that the majority of the purchase price was financed and that he and his wife used their joint funds to pay the balance. The condominium was purchased for their oldest son's use while he attended college in Colorado. The property was sold in 1997 or 1998 for approximately $60,000.00.

## 5. Transfers from corporate checking account to joint checking accounts.

At some point, not made clear by the testimony, Ryan and his wife entered into an agreement with their bank, Midwest Bank, for the automatic transfer of funds from the account of the professional corporation to cover overdrafts incurred by Chris Ryan on her personal account. The Ryans had two personal bank accounts, with the Debtor carrying the checkbook for one and Chris Ryan carrying the checkbook for the other. However, both of them could write checks on both accounts. Apparently, Chris Ryan had a habit of overdrawing her account. To remedy this situation, the Ryans agreed with Midwest Bank that, whenever Chris Ryan wrote an insufficient funds check, the bank would automatically transfer funds from John Ryan's professional corporation's checking account to the personal checking account to cover the overdraft. John Ryan testified that these transfers were not considered as income by him, and accordingly the transfers were not included on the Ryans' tax returns. There was no testimony that those transfers were ever repaid to the corporation. Ryan testified that there was nothing sinister about these transfers because that was the way the Ryans had covered Chris Ryan's overdrafts for several years, beginning before the IRS undertook its collection efforts. Though the amounts of these transfers were not great, they nonetheless demonstrate Ryan's cavalier attitude toward his

---

9. No issue has been raised about Ryan's Missouri income taxes. Presumably, those taxes were not paid, either.

tax reporting and payment obligations. The transfers amounted to a diversion of funds that could otherwise have been applied to the Debtor's tax obligations.

One thing Ryan does not seem to understand is that, before his earnings become the joint property of him and his wife, the earnings are first his personal income and earnings and as such are subject to the liens of the Government.

### 6. Levy against professional corporation and stoppage of salary.

Most damaging to Ryan is what occurred in 1996 with his professional corporation. In approximately June 1993, Ryan set up a professional corporation, John P. Ryan, Jr., P.C. According to Ryan, he set up the corporation on the advice of his accountant and tax lawyer, Michael J. Messina, to accomplish three goals: To provide for the withholding of income taxes because of Ryan's past problems in timely paying his taxes; to establish a retirement plan since Ryan did not have such a plan; and to provide other benefits (such as insurance) that could be taken as tax deductible items through the corporation. Messina testified that his purpose in suggesting the professional corporation was to provide "financial discipline" for Ryan and to help prevent him from falling behind in the payment of his taxes, as Ryan obviously had a habit of doing. Ryan was the president of the corporation, which operated the law practice that Ryan had previously operated as a sole proprietorship.

When efforts to obtain voluntary payments on the delinquent taxes were unsuccessful, the IRS issued a Notice of Levy on the professional corporation on March 4, 1996, in an attempt to intercept Ryan's earnings from his law practice. (Pl.Ex. 6) When a prompt response to that levy was not received, the IRS on March 19, 1996, served a final demand on the corporation for payment of the amount then delinquent, $232,645.34. (Pl.Ex. 7) Ryan apparently did two things in response to the levy and the final demand. First, on March 30, 1996, Ryan wrote a letter to Osborn at the IRS stating that "this corporation does not have any property due John P. Ryan at this time." (Pl.Ex. 8) Second and more importantly, Ryan simply stopped paying himself a salary, in obvious defiance of the levy.[10] Ryan admitted that he stopped taking a salary from the corporation to prevent the IRS levy from attaching his earnings.

What is not clear is what Ryan did to obtain money for his family's living expenses, after supposedly stopping his salary. Prior to the issuance of the levy, Ryan had withdrawn $10,000.00 from the corporation in the first two months of 1996. Ryan testified that, after stopping his salary, he began to handle his own legal business as a private practice, although the corporation continued to operate as well.[11] According to Schedule C of Ryan's 1996 tax return (Pl.Ex. 40), he had only $7,680.00 in gross income from his legal practice for the rest of 1996, and his total income for the year was allegedly just

10. An IRS levy continues in effect until it is terminated by the IRS. The Notice of Levy received by Ryan's office—it was served on an associate attorney in Ryan's office who also had the title of assistant office manager—stated:

"Items levied on to pay this are: (1) all wages and salary for personal services of this taxpayer that you now possess or for which

you [the professional corporation] become obligated, from the date you receive this notice of levy until a release of levy is issued..."

11. Ryan testified that he has had up to two associate lawyers working in his firm at one time or another. There was no testimony as to how many associates he had in 1996.

$16,716.00. (Def.Ex. 6) This was in stark contrast to $69,680.00 in salary paid to Ryan by the corporation for the last seven months of 1993, $133,219.00 in 1994, and $93,700.00 in 1995. (Pl.Exs. 34–36) The picture is muddied further by the fact that the professional corporation—of which Ryan was the president and at least 50 per cent shareholder [12]—stopped filing federal tax returns after 1995, although Ryan testified that the corporation continued in existence until the end of 1999.[13]

At trial, Ryan testified that there was a period of time when he had to borrow money from friends in order to support his family. However, he offered no corroborating testimony or evidence to support that contention, and the Court simply finds it unworthy of belief. The logical conclusion to be drawn from the pattern of conduct engaged in by Ryan is that, in complete defiance of the IRS's attempts to levy on his income, Ryan continued to extract money from the professional corporation to support the lifestyle to which he and his family had become accustomed, and he simply evaded the IRS levy by refusing to honor it.

From the time the levy was served on the corporation in March until the end of 1996, the corporation deposited $461,657.52 in its bank account. Ryan apparently would have the Court believe that he received none of that, a proposition that

simply defies belief. In the absence of accounting records—which would be within the exclusive control of Ryan—we can only surmise what became of that $461,657.52. A safe inference is that Ryan himself received a substantial amount of that income and spent it for his family and personal living expenses. It is simply not credible that Ryan received only $16,716.00 in total income for 1996 from his law practice when the corporation of which he was the president and the law firm of which he was the principal had income of at least $461,657.52 in the last seven months of the year.

This testimony is even more incredible when one considers the income reported by Ryan in prior years. In 1993, Ryan reported profit from his law practice in the five months before he formed his professional corporation of $85,762.00 and he reported W–2 income from the professional corporation that year of $69,680.00, a total from his law practice that year of $155,442.00. (Pl.Ex. 37) In 1994, Ryan reported income from his legal practice on Schedule C of $99,541.00, plus an additional $133,319.00 in W–2 income from the professional corporation, a total of $232,860.00. (Pl.Ex. 38) In 1995, he reported W–2 income from the professional corporation of $107,673.00. (Pl.Ex. 39) The logical conclusion to be drawn from all of this is that Ryan extracted what he

---

**12.** Ryan pretended ignorance as to whether he owned 50 percent or 100 percent of the stock of the professional corporation, or whether he and his wife owned part or all of the stock jointly. Under Missouri law, a nonprofessional cannot own stock in a professional corporation, Mo. Rev. Stat. § 356.111, so we are left to guess as to Ryan's ownership interest in the professional corporation. Furthermore, it would be a violation of the Rules of Professional Conduct for Chris Ryan to own any interest in the professional corporation because she is not a lawyer. See Mo. Sup Ct. R. 4–5.4(d).

**13.** Between March 1996 and June 1998, deposits totaling $1,139,117.01 were made to the corporation bank account, according to banking records obtained by the IRS. (Pl.Ex. 31) Ryan contended that these deposits included at least $63,988.00 in proceeds from loans that Ryan and his wife had obtained personally, but which were incorrectly deposited in the corporation's bank account. Even if we accept Ryan's contention in that regard, the corporation nevertheless deposited $1,075,129.01 in its account for this period.

needed—or wanted—from the professional corporation in 1996, in total and complete defiance of the IRS's levy on his earnings.

### 7. Purchase of tractor by corporation

Another example of Ryan's evasion, according to the IRS, was the purchase of a John Deere tractor. On July 12, 1996, Ryan purchased a tractor and mower from an implement dealer for $19,000.00; the names on the purchase invoice were John P. Ryan and Linda C. Ryan (Ryan testified that he personally wrote Linda Ryan's name on the invoice). (Pl.Ex. 41) The implement dealer was paid with a $19,000.00 check drawn on Ryan's professional corporation. (Pl.Ex. 42) Ryan testified that he used the corporate bank account because he was unable to secure a loan before the transaction closed. He explained that he did receive a bank loan, although it was two or three days after he had written the check. The bank statements admitted in evidence seem to support Ryan in this matter inasmuch as there was a deposit of $21,296.51 made on July 16, 1996, the same day the $19,000.00 check cleared the corporation's checking account. (Pl.Ex. 28) Ryan insisted that he and his wife—not the professional corporation—repaid the bank loan, though they offered no further proof of that.

### 8. Purchase of the Colorado condominium

Another somewhat suspicious transaction involving the corporation bank account occurred in July 1996, as well. On July 30, 1996, the corporation received a wire transfer of funds in the amount of $44,988.00. (Pl.Ex. 28) On that same date, the corporation issued a check for $44,988.00 to Ryan personally. (Pl.Ex. 43) Ryan testified that the $44,988.00 received by the corporation represented proceeds from a loan Ryan and his wife had ob-

tained from a bank in Colorado. The loan was supposedly secured by a condominium the couple owned in Gunnison, Colorado, and which had been occupied by their oldest son while he attended college. Ryan testified that the condominium was later sold for approximately $60,000.00 in 1997 or 1998; no part of the proceeds was applied to Ryan's delinquent taxes, inasmuch as the property was owned jointly by Ryan and his wife. Once again, Ryan offered no other evidence to support his version of these transactions.

Even assuming, for the sake of argument, that Ryan's testimony is correct, these transactions again demonstrate the cavalier attitude that Ryan has taken toward the proper handling and accounting of his financial affairs. From the evidence, it is clear that Ryan has repeatedly mixed his personal accounts and finances with those of his professional corporation and that he has used the professional corporation for his own purposes and for his own advantage in improper ways. One purpose for engaging in such activities, it can be inferred, would be to confound and confuse the IRS and make collection of Ryan's delinquent taxes more difficult. The Court has no trouble in making this inference.

### 9. The Government's Civil Action

Frustrated by its efforts to collect the taxes Ryan owed, the Government sued Ryan and his professional corporation in U.S. District Court in 1998. *United States v. John P. Ryan, Jr. and John P. Ryan, Jr., P.C., a Missouri Corporation*, Case No. 97–1424–CV–W–5 (USDC W.D. Missouri). (Pl.Ex. 62) On October 12, 1999, by consent, a judgment was entered in favor of the United States and against Ryan and his corporation. (Pl.Ex. 63) In that action, the Government obtained a judgment of $100,000.00 against the professional corpo-

ration pursuant to 26 U.S.C. § 6332(d)(1) for the corporation's wrongful refusal to honor the March 4, 1996, Notice of Levy, plus a 50 percent penalty of $50,000.00 pursuant to 26 U.S.C. § 6332(d)(2). The judgment also liquidated Ryan's personal tax obligations for 1988, 1989, and 1991 in the amount of $134,030.67. Ryan testified that he made one or perhaps two payments of $1,000.00 each on this judgment. When Ryan continued to refuse to pay the judgment, the Government filed a Motion in September 2000 seeking a District Court order compelling Ryan to make payments of $5,000.00 a month on the judgment, inasmuch as his personal earnings as an attorney were not subject to garnishment. (Pl.Ex. 64) A hearing was scheduled on that motion for December 7, 2000. (Pl.Ex. 65) However, before that hearing could be held, Ryan filed these bankruptcy proceedings on December 7, 2000.

There are two remarkable things about this civil action and the judgment obtained by the Government. First, the professional corporation which Ryan owned (in whole or part) and which he headed acknowledged in the Consent to Judgment (Pl.Ex. 63) that it had *wrongfully refused* to honor the IRS's March 4, 1996, levy on Ryan's earnings. Moreover, the corporation consented to a 50 percent penalty ($50,000.00) for its refusal to honor the levy. Ryan acknowledges that he was the president of the corporation and was the principal law-

yer in the law firm. In short, Ryan called the shots. Apparently, he—in consultation with his attorneys—was the one who consented on behalf of the corporation to the judgment entered in the District Court. Despite these concessions, Ryan would nevertheless have this Court believe that he did nothing to evade payment of his tax obligations. Ryan's actions have spoken much louder than his words.

Second, Ryan's failure to make any significant payments on the consent judgment is further evidence of his willful evasion of the taxes he owed. In over one year, Ryan paid—at most—$2,000.00 on the judgment. At the same time, he was also failing to pay his current taxes. At trial, Ryan casually dismissed his failure to make payments on the judgment by saying that "everyone" knew he would not be able to make the payments he had agreed to make. Coming from an attorney, this casual indifference to and disregard for a lawful judgment of a United States Court is particularly repugnant.[14]

### 10. Holding property as tenants by the entireties

The Plaintiff makes much of the fact that Ryan and his wife held all of their property as tenants by the entireties, thereby placing virtually all of Ryan's assets (other than his earnings) beyond the reach of the IRS's collection efforts.[15] The

---

**14.** As a fellow member of the Bar, the Court is especially offended by Ryan's behavior and attitude.

**15.** That situation may be changing, in light of the United States Supreme Court's recent decision in *United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002). In *Craft*, the Supreme Court held that the individual taxpayer's failure to pay federal income taxes resulted in the attachment of a federal tax lien on the entireties property. The Court relied upon the statutory language of 26 U.S.C. § 6321 to hold that Congress

intended to reach any and all of a taxpayer's interest in his property to satisfy the collection of taxes. *Id.*, 122 S.Ct. at 1422–23. Although the Court acknowledged that each spouse has a property interest in the entireties estate, it further explained that "each tenant possesses individual rights in the estate sufficient to constitute 'property' or 'rights to property' for the purpose of the lien...." *Id.*, 122 S.Ct. at 1419. The IRS apparently has not yet tested the *Craft* ruling, at least in Missouri.

Court is not persuaded by this argument. It is customary for husbands and wives in Missouri to take title or ownership of both real and personal property as tenants by the entireties; to do otherwise is exceptional and might well be cause for inquiry. Moreover, the Court accepts Ryan's testimony that he and his wife—who have been married for approximately 30 years—have always acquired their properties as tenants by the entireties, going back several years before Ryan began to encounter problems paying his taxes. Finally, with the exception of the John Deere tractor and the Colorado condominium, the Plaintiff has failed to show that Ryan acquired any substantial real or tangible personal property after 1988 that would have been subject to levy by the IRS but for the tenants by the entireties ownership. Certainly, the Plaintiff has not demonstrated that Ryan transferred any real or personal property after 1988 from his individual name to himself and his wife as tenants by the entireties in an effort to hinder the Government's collection efforts, with the exception, of course, of his personal income and earnings as discussed hereinabove.

### 11. Post–Petition Interest

■ The IRS requested that the Court find the accrued interest on the tax liability is also nondischargeable. The IRS offers as authority for this request *Hanna v. U.S.* (*In re Hanna*), 872 F.2d 829 (8th Cir.1989). The Eighth Circuit in *Hanna* held that post-petition interest is nondischargeable if it arises out of a nondischargeable tax liability. Like the facts in the instant case, *Hanna* involved a Chapter 7 proceeding where the Debtor owed the nondischargeable tax liabilities. This Court is bound to follow this precedent. Therefore, the Court finds that the interest which accrued post-petition is nondischargeable as it is an integral part of the underlying tax liability.

## CONCLUSION AND ORDER

In this Court's view, this is a clear-cut case of an individual who has made a conscious and willful decision not to pay his taxes or, in the words of the statute, to willfully evade or defeat his taxes. Though he has made some payments on his taxes over the years, he has—for almost 14 years—failed to pay the taxes that he admits are legally and lawfully owing and has engaged in a pattern of conduct to avoid paying the full amount of taxes owed. He has diverted his separate income into high-risk, unsuccessful investments, rather than paying his taxes as they came due. He has elected to spend money on a condominium in Colorado for the use of his college-age son and to acquire a relatively expensive farm tractor rather than pay his taxes. He has chosen to pay $30,000.00 a year in tuition, room and board, and other expenses so that his youngest son could attend a prestigious private university, rather than paying his taxes. Despite being self-employed as an attorney for most of his adult life, Ryan has persisted in not paying his taxes on a quarterly, estimated tax basis as required by law, and he has continued to ignore those legal requirements right up to the date of trial, resulting in tens of thousands of dollars more in delinquent taxes post-petition. He has voluntarily transferred money from his professional corporation to personal bank accounts to cover overdrafts of his wife, without recognizing such transfers as taxable income. When confronted with the IRS's collection efforts, Ryan never attempted to work out any kind of voluntary agreement for payment of his delinquent taxes, while at the same time he continued his pattern of not paying his current taxes. When sued by the Government in District Court, Ryan consented to a judgment on behalf of himself and his

professional corporation, but then made only one or perhaps two payments on that judgment and filed bankruptcy the day before a scheduled hearing on a motion to compel him to make the payments he had promised to make. Finally, and perhaps most importantly, when the IRS levied on his income from his professional corporation, Ryan caused the corporation to stop issuing pay checks to him, despite the fact that the professional corporation continued to deposit thousands of dollars in the corporate account each month.

For all of these reasons, the Court has no difficulty in concluding that Ryan has engaged in a pattern of conduct aimed at willfully and deliberately attempting to evade or defeat his lawful tax obligations, as provided in 11 U.S.C. § 523(a)(1)(C), and that he should not be discharged from those obligations.

Therefore, it is

**ORDERED** that the United States of America be and is hereby granted the relief sought in its Complaint, and the Debtor, John P. Ryan, Jr., be and is hereby denied discharge of the federal income taxes owed for the years 1988, 1989, 1991, 1993, and 1994, plus pre-petition and post-petition interest accrued thereon, pursuant to 11 U.S.C. § 523(a)(1)(C). The costs of this action are taxed against the Debtor.